# EXHIBIT A

| | |
|---|---|
| **DISTRICT COURT, DENVER COUNTY, COLORADO**<br>1437 Bannock Street, Room 256<br>Denver, CO 80203 | DATE FILED: January 25, 2017 9:33 PM<br>FILING ID: A1CC78504ED2E<br>CASE NUMBER: 2017CV30336 |
| **Plaintiff:**<br>STEPHANIE CLAIR,<br><br>v.<br><br>**Defendants:**<br>MEDTRONIC, INC., a Minnesota corporation, and<br>MEDTRONIC SOFAMOR DANEK USA, INC., Tennessee corporation. | ▲COURT USE ONLY▲ |
| Attorney for Plaintiff:<br>James W. Avery #13037<br>AVERY LAW FIRM<br>44 Cook St., Ste. 100<br>Denver, Colorado 80206<br>Phone: (303) 840-2222<br>Fax: 303-328-2976<br>Email: avery@averylawfirm.com | CASE NUMBER:<br><br>DIV/COURTROOM: |
| **COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** ||

Plaintiff STEPHANIE CLAIR, by and through her attorney, James W. Avery, as her complaint against Defendants, states and alleges as follows:

## INTRODUCTION

1.      This case involves a spinal surgery in which a bio-engineered bone graft device known as the Infuse® Bone Graft ("Infuse®") was implanted in Plaintiff STEPHANIE CLAIR in an off-label surgery performed by her surgeon.

2.      Infuse® was designed and manufactured by Defendants MEDTRONIC, INC., and MEDTRONIC SOFAMOR DANEK, USA, INC. (collectively "the MEDTRONIC Defendants" or "MEDTRONIC") and was illegally and improperly promoted and sold by MEDTRONIC for off-label uses in spine surgery patients, including in STEPHANIE CLAIR's posterior approach lumbar surgery.

3.      Infuse® is the trade name for rhBMP-2, bone morphogenetic protein. It was approved by the Federal Drug Administration ("FDA") in 2002 for only one specific type of

spine surgery - one level fusion in the lumbar spine that is performed through the abdomen (anterior) using a hollow metal cylinder called an LT-Cage®.

4.      Infuse® is not, and never has been, approved for use without an LT-Cage®. Infuse® is not, and never has been, approved for use in posterior approach lumbar spine surgeries. These surgeries are thus "off-label."

5.      When Infuse® is used off-label, such as without an LT-Cage® or in a posterior-approach spine surgery, it often causes uncontrolled bone growth, inflammation and scar tissue (known as "ectopic" or "exuberant" bone growth, inflammation and scar tissue ), tissue swelling or inflammation and scar tissue formation onto or around the spinal cord or the spinal nerves. When the spinal cord or spinal nerves are compressed by ectopic/exuberant bone growth, inflammation and scar tissue, a patient can experience, among other side effects, extreme and debilitating pain in the legs and back, which is precisely what happened to Plaintiff STEPHANIE CLAIR.

6.      MEDTRONIC recklessly and/or intentionally minimized and/or downplayed the risks of serious side effects related to the use of Infuse®, and especially those risks related to the off-label use of Infuse®, including but not limited to the risk of ectopic or uncontrolled bone growth, inflammation and scar tissue .

7.      According to articles in the June 2011 issue of the *Spine Journal* (an international medical journal that publishes peer-reviewed research articles related to evidence-based spine care), earlier studies paid for by MEDTRONIC inaccurately reported the safety of Infuse® (rhBMP-2) by grossly underestimating its risks and failing entirely to report significant side effects, including ectopic or uncontrolled bone growth, inflammation and scar tissue .

8.      In fact, an earlier study sponsored and/or funded by MEDTRONIC in 1999, years prior to FDA's approval of Infuse® for anterior approach lumbar spine fusions, demonstrated an approximately 70% rate of ectopic bone growth, inflammation and scar tissue . MEDTRONIC discouraged the publication of these results in the medical journal literature, thereby hiding ther significant side effect from spine surgeons and patients.

9.      Only a few months into one of the first clinical trials of the Medtronic product known as Infuse®, CT scans showed unwanted bone had formed in the spinal canals of 70% of the patients. The clinical trial, intended to include hundreds of people with degenerative disc disease, was halted after only 34 patients received Infuse® implants.

10.      In 2004, a paper written about the trial by doctors with financial ties to MEDTRONIC maintained that these patients were not harmed by Infuse®. The paper downplayed the excessive, ectopic, bone growth, inflammation and scar tissue , claiming that while it showed up on CT scans, patients did not suffer ill effects.

11.      But David Malone, M.D., a Tulsa, Oklahoma surgeon involved in the clinical trial, told the *Milwaukee Journal Sentinel* that two of her patients had to undergo additional surgeries because the bone overgrowth was painfully impinging on their nerve roots. One of the patients, a man who was in her 50s at the time, needed three operations - one for the implant, a second to remove the unwanted bone formation, and then a third when the additional bone grew back yet again.

12.     "It was a pretty amazing biological response," Malone said in an interview. "It grew back even larger than the first time. It got to the point that secretaries in our clinic could look at X-rays and tell who got the BMP (Infuse) and who did not..."

13.     The MEDTRONIC-funded studies on Infuse® from 1999 to until at least 2007 omitted any mention of the adverse effects that were observed in the earliest trials of Infuse®, such as severe uncontrolled or ectopic bone growth, severe inflammatory reactions, adverse back and leg pain events, radiculitis, retrograde ejaculation in men, urinary retention, bone resorption, and implant displacement. These MEDTRONIC-funded articles also omitted any mention of the risks of sterility and cancer associated with rhBMP-2 use, as reported in Food and Drug Administration documents and hearings.

14.     The actual rate of incidence of these serious side effects is much greater than the rate disclosed by MEDTRONIC itself or by these MEDTRONIC-sponsored studies to physicians or to the public. With respect to posterior lumbar fusions—the surgery that Plaintiff STEPHANIE CLAIR underwent—MEDTRONIC failed to disclose significant risks that it knew of or should have known of, including ectopic bone formation, radiculitis, osteolysis, cage migration, and worse overall outcomes.

15.     Because of MEDTRONIC's wrongful conduct in actively and illegally promoting the off-label uses of Infuse®, such as for posterior approach lumbar fusion, and because of MEDTRONIC's additional wrongful conduct in minimizing, concealing, or downplaying the true risks of these non-FDA approved off-label uses of its product Infuse®, thousands of spine patients, including Plaintiff STEPHANIE CLAIR, underwent surgeries without knowing the true risks inherent in the off-label use of Infuse®.

16.     MEDTRONIC and MEDTRONIC's "opinion leaders," or "thought leaders" who are paid physician promoters of Infuse®, and MEDTRONIC sales representatives, have orchestrated a marketing campaign over the past decade to persuade spine surgeons to use Infuse® for dangerous off-label uses such as posterior-approach lumbar fusion surgery and cervical spine surgery with Infuse®.

17.     The *Wall Street Journal* and *New York Times* reported in 2009 that MEDTRONIC consultant Timothy Kuklo, M.D., while an orthopedic surgeon at Walter Reed Army Medical Center, submitted an article to a British medical journal with allegedly fabricated claims regarding the efficacy of Infuse® and reporting that Dr. Kuklo allegedly forged the signatures of the four "co-authors" of the paper. MEDTRONIC confirmed that Dr. Kuklo was a paid consultant for MEDTRONIC and that the company paid him over $800,000 over an eight year period.

18.     Dr. Kuklo resigned from the Army amidst a court-martial investigation into her conduct in promoting Infuse® while being paid by MEDTRONIC as a consultant, and then was later suspended from—and eventually resigned from—her post at Washington University in St. Louis in the wake of the allegations that she had overstated the benefits of Infuse®.

19.     As a direct result of her off-label, posterior-approach Infuse® surgery, Plaintiff STEPHANIE CLAIR has suffered severe bodily injuries and pain. She has suffered paraplegia and intractable back and leg pain caused by the Infuse® implanted in her body, which seriously injured her spinal nerves. Ms. CLAIR has undergone pain management treatment since the off-label Infuse® surgery, but nothing to date has relieved her pain.

20.    Plaintiff STEPHANIE CLAIR is retired. Because of her off-label surgery using Infuse®, her ability to enjoy life has been significantly impaired.  She suffers from paralysis and continuous pain in her legs and back from everyday activities, such as sitting, standing, and walking for extended periods of time.

21.    Plaintiff did not know, and could not have known by the exercise of reasonable diligence, prior to January 26, 2015 at the earliest that the off-label use of Infuse® caused abnormal ectopic bone growth, inflammation and scar tissue that could result in paralysis (as an unintended but forseeable result of surgery to correct the complications from use).

22.    Before and after the surgery using Infuse®, Defendants knowingly concealed from surgeons (and Plaintiff), or at the direction of Defendants the surgeons concealed from Plaintiff the high risk of significant danger from using Infuse® off-label.  Defendants also knowingly concealed from Plaintiff that her surgeons had significant financial ties to MEDTRONIC. Defendants' fraudulent concealment tolled any relevant statutes of limitation.

23.    Her surgeon also concealed from Plaintiff that the off-label use of Infuse® in fact did cause ectopic bone growth, inflammation and scar tissue in Ms. CLAIR. Her surgeon knew that Ms. CLAIR suffered from inflammation and scar tissue  as early as April, 2014. Her surgeon treated Ms. CLAIR for another 9 months. During that period Ms. CLAIR continually complained of increased pain. Nevertheless, Her surgeon repeatedly assured Ms. CLAIR that the pain  was normal, natural consequence of her injury, and never told Ms. CLAIR that it was unusual, was injuring her, or that it was caused by the Infuse®.  Plaintiff was eventually paralyzed as a result of the surgery performed on January 26, 2015 to correct the condition that developed from the use of Infuse®.

## PARTIES

32.    Plaintiff  STEPHANIE CLAIR is an individual who resides in Aurora, Colorado.

33.    Defendant MEDTRONIC, INC. is a Minnesota corporation, with its principal place of business at 710 MEDTRONIC Parkway, Minneapolis, Minnesota 55432.

34.    Defendant MEDTRONIC SOFAMOR DANEK USA, INC. is a Tennessee corporation, with its principal place of business at 1800 Pyramid Place, Memphis, Tennessee 38132.

## JURISDICTION AND VENUE

35.    The Court has subject matter and personal jurisdiction over Defendants because the events giving rise to ther Complaint occurred in Colorado. Defendants, at all times relevant to ther action, engaged in the use, sale, labeling, marketing, distribution and/or promotion of Infuse® in Colorado. As such, the Defendants purposefully availed themselves of the privilege of conducting activities within the State of Colorado and, in fact, maintain regular and continuous business contacts within the State. Plaintiff sustained injury as a result of Defendants' conduct in ther jurisdiction.

36.    Venue is proper in ther jurisdiction pursuant to C.R.C.P. 98(c)(5) because the

- 4 -

MEDTRONIC Defendants reside in Denver County, and because the tortious conduct, or some of it, occurred in Denver County.

## BACKGROUND

### A.    The Infuse® Device

40.    MEDTRONIC designed and marketed Infuse® for lumbar spine fusion surgery, a surgical technique in which one or more of the vertebrae of the spine are united together ("fused") so that motion no longer occurs between them.

41.    Spinal fusion is used to treat a number of conditions, including treatment of a fractured vertebra, spinal deformities (spinal curves or slippages), back pain from instability, or abnormal or excessive movement between vertebrae. Similar to the concept of welding, spinal fusion surgery uses bone grafts to join vertebrae together and eliminate or reduce movement between.

42.    In a bone graft procedure, the graft—usually bone or bone-like material—is placed around the vertebrae during surgery. Over the following months, a physiological mechanism similar to that which occurs when a fractured bone heals causes the graft to join, or "weld," the vertebrae together. The goal of spinal fusion is to obtain a solid fusion of the vertebrae.

43.    For years, autologous bone graft has been considered the "gold standard" in fusion surgery. In an autologous bone graft—or "autograft"—the surgeon procures bone graft material from another part of the patient's body, typically from the patient's pelvis or iliac crest, and implants the bone graft in the site where fusion is desired. Successful fusions occur at significantly high rates in autograft procedures, as the harvested bone exhibits all the properties necessary for bone growth, inflammation and scar tissue  (including osteogenic, osteoconductive and osteoinductive properties).

44.    As an alternative to autograft, patients can undergo an "allograft" procedure, in which bone is taken from the cadavers of deceased people who have donated their bone to so called "bone banks." Although healing and fusion is not as predictable as with the patient's own bone, an allograft eliminates the need for the harvest procedure required in an autograft.

45.    A newer option to traditional bone graft procedures is bio-engineered and bio-manufactured bone-growth materials, including rhBMP-2 (Infuse) . Infuse® and similar materials are thus appealing to many spine surgeons, since they can obviate the need for autograft harvested from the patient's own body.

46.    Infuse® is a genetically engineered material containing a bone morphogenetic protein ("rhBMP-2"), and is used as an alternative or supplement to autograft and allograft to

help fuse vertebrae in the lower (lumbar) spine in order to treat degenerative disc disease. The purpose of Infuse® is to accomplish the same clinical outcomes as grafting a patient's own bone into these locations but without the need to grafting bone from the hip and other sites.

48.    Infuse® consists of three components split among two parts: (1) a metallic spinal fusion cage (the LT Cage); and, (2) the bone graft substitute which consists of liquid rhBMP-2 (derived from Chinese hamster cells) along with (b) a sponge-like carrier or scaffold for the protein (manufactured from bovine collagen) that is placed inside the fusion cage.

49.    The fusion cage component maintains the spacing and temporarily stabilizes the diseased region of the spine, while the Infuse® bone graft component is used to form bone, which is intended to permanently stabilize (fuse) ther portion of the spine.

50.    During surgery, the rhBMP-2 is soaked onto and is intended to bind with the absorbable collagen sponge that is designed to resorb, or disappear, over time. As the sponge dissolves, the rhBMP-2 stimulates the cells to produce new bone.

51.    The MEDTRONIC Defendants acquired at some time prior to 2002 the exclusive rights to rhBMP-2 for spinal applications.

52.    Certain BMPs have been studied for decades because of their ability to sheal bone and potentially decrease or eliminate the need for bone graft harvesting from other parts of the body.

53.    Scientists isolated the gene for one protein (rhBMP-2) from bone tissue and used molecular biology techniques to create genetically engineered cells. These cells then produce large quantities of rhBMP-2. A similar process is used to manufacture other proteins, such as insulin.

**B.    The FDA Approval Process and Hertory of Approval for Infuse®**

54.    On January 12, 2001, MEDTRONIC filed the Infuse® pre-market approval application ("PMA") and was granted expedited review status by the United States Food and Drug Administration ("FDA").

55.    On July 2, 2002, the FDA approved Infuse®, but only for use in the lower, or lumbar, region of the spine (at levels L4 through S1) to treat degenerative disc disease, and was approved only for anterior-approach surgeries at L4 through S1. That meant that it was initially approved only to be used by surgeons in spinal fusions when going in through the patient's abdomen.

56.    Despite the fact that the FDA only approved rhBMP-2 for use in the spine in combination with use of the LT Cage, MEDTRONIC sells Infuse® separately from the LT cage.

57.    On information and belief, MEDTRONIC sells the rhBMP-2 component separately from the LT cage in order to illegally and improperly promote off-label uses of Infuse® in the lumbar spine and in the cervical spine.

- 6 -

58.     According to the label approved by the FDA, Infuse® can only be used in an Anterior Lumbar Interbody Fusion ("ALIF")'procedure, involving a single-level fusion in the L4-S 1 region of the lumbar spine. ALIF is performed by approaching the spine from the front of the body through an incision in the abdomen and is primarily used to treat pain resulting from degenerative disc disease.[4]

59.     In addition to use in anterior approach lumbar spine fusions, Infuse® has been approved by the FDA for only two other uses: certain oral maxillofacial surgeries and repair of tibial fractures that have already been stabilized with IM nail fixation after appropriate wound management. Infuse® was approved by the FDA on March 9, 2007, for certain oral maxillofacial uses.

60.     Infuse® has never been approved by the FDA for use in other parts of the body or for use in any other type of procedure. Any such uses are thus, by definition, "off-label" experimental uses.

61.     Physicians may use FDA-approved medical devices in any way they see fit -- either on-label or off-label, but medical device companies are prohibited by federal law to promote off-label uses for their medical devices or to pay doctors inducements or kickbacks to promote off-label uses, or to perform procedures using the devices off-label. When a physician wisshes to use a medical device in an off-label manner, she or sshe must inform the patient of the off-label nature of the surgery and the expected risks and benefits of such off-label use, and obtain the patient's informed consent to such use.

62.     The MEDTRONIC Defendants are medical device companies, not physicians, and they were thus prohibited by federal law including the relevant FDA regulations, at all relevant times, from promoting to physicians or patients any off-label use of Infuse®.

63.     The use of Infuse® for posterior lumbar fusion surgery has never been approved by the FDA, and the use of ther product through a posterior approach is thus an off-label use.

64.     The FDA's limited use approval of Infuse® in 2002 was based on concerns about potential adverse events -- including ectopic bone growth, inflammation and scar tissue  -- that already had been reported with the product at the time of approval. As a result, the FDA approved Infuse® for a small percentage of overall spinal fusion surgeries, with the device label specifying the limited surgical applications for which it was deemed to be safe and approved for use.

65.     There are numerous lumbar spine surgical procedures for which Infuse® was not approved, and for which it has never been approved. These lumbar procedures include:

        a.     Posterior Lumbar Interbody Fusion ("PLIF"), a procedure that is used to treat nerve, compression, and back pain resulting from a number of causes, involves approaching

[4] While the product's label remains substantially the same as that approved by the FDA in 2002, the FDA has made minor amendments to the label through post-approval supplements. For example, on July 29, 2004, the FDA approved a supplement expanding the indicated spinal region from L4-S1 to L2-S1 and later granted approval for uses in certain oral maxillofacial surgeries.

the spine from the back. PLIF, however, is a more sensitive surgical approach and procedure because the spinal canal and nerves are posterior to the vertebral body, and because a surgeon must manipulate the ducal sac (the membranous sac that encases the spinal cord within the vertebral column) to perform the PLIF procedure;

        b.     Posterolateral Fusion which is similar to the PLIF procedure, but instead of removing the disc space and replacing it with a bone graft, the disc space remains intact and the bone graft is placed between the transverse processes in the back of the spine. Ther allows the bone to sheal and stabilizes the spine by fusing the transverse process of one vertebra to the transverse process of the next vertebra; and

        c.     Transforaminal Lumbar Interbody Fusion ("TLIF"), which is also similar to the PLIF procedure, and is a technique utilized when an inter-body fusion is performed via a posterior approach. TLIF allows the surgeon to perform a fusion from a posterior approach without disturbing the dural sac by approaching the spine via a more lateral, or sideways, approach.

66.     Plaintiff are informed and believe and based thereon allege that, at the FDA Advisory Committee Panel shearing on January 10, 2002 concerning FDA approval of MEDTRONIC's Infuse®, the panel members stressed concerns regarding potential off-label use of the product and repeatedly asked the MEDTRONIC presenters questions about how the Company would seek to guard against off-label applications of the product.

67.     Plaintiff are informed and believe and based thereon allege that, at the conclusion of the shearing, the FDA Advisory Panel again reiterated concerns regarding the potential for off-label use, specifically admonishing the MEDTRONIC Defendants to guard against procedures other than the specific ALIF (anterior lumbar interbody fusion) procedure approved in the labeled application.

68.     For example, Panel member Dr. John Kirkpatrick noted her concern that procedures other than ALIF—especially the PLIF procedure—could result in harm to patients. According to Dr. Kirkpatrick, the use of the tapered LT-CAGE—which is difficult to implant in a posterior approach—would, if required, "prevent a majority of surgeons from applying ther from a Posterior Lumbar Interbody Fusion perspective."

69.     Plaintiff are informed and believe and based thereon allege that, even at the time of FDA approval, MEDTRONIC and its senior management and its paid consultant "opinion leaders", were well aware of the concerns regarding off-label uses of Infuse® and the serious dangers posed by those off-label uses.

70.     Plaintiff are informed and believe and based thereon allege that, subsequent medical studies published prior to 2007 confirmed the fears of the FDA Advisory Panel that use of Infuse® outside of the studied application sought in the PMA could present severe risks to patient safety.

71.     Although the adverse outcomes reported in medical journals and other sources were well known to MEDTRONIC and its key opinion leaders, including her surgeon, by 2007, these Defendants concealed the dangers from other surgeons and from spine patients.

### C.     Infuse® is a Very Profitable Part of MEDTRONIC's Business

72.     Infuse® has become a best seller for MEDTRONIC. Sales of Infuse® were approximately $800 million for the 2011 fiscal year, and the vast majority of these sales were attributable to off-label use of the product. Off-label uses of Infuse® account for 85% to 90% of all spine surgeries involving Infuse®.

73.     MEDTRONIC's total revenues from the sale of Infuse® from 2002 to 2011 exceed 4 billion dollars.

74.     MEDTRONIC has depended heavily on Infuse® sales because so many of its other products, such as cardiac defibrillators, have slowed as the result of recalls of those defective defibrillators in the past several years.

75.     MEDTRONIC has consistently sought to expand the use of Infuse® by, among other things, illegally and improperly promoting dangerous and/or insufficiently studied off-label uses for Infuse® in various parts of the spine for various types of spine surgeries.

76.     MEDTRONIC has sought to expand the off-label uses (and has succeeded in doing so) by paying large amounts of money to key "opinion leader" spine surgeons around the country, many of whom then published studies and articles advocating the off-label use of Infuse® and minimizing the side effects of these uses.

77.     MEDTRONIC, for example, paid more than $45 million to the 12 spine surgeons who authored the first 13 studies sponsored by MEDTRONIC on Infuse®.

### D.     Off-Label Use of Infuse® in the Lumbar Spine is Dangerous and Causes Adverse Side Effects

78.     The off-label use of Infuse® in the spine frequently causes serious adverse events. Ther has been known to MEDTRONIC and its key opinion leaders for many years.

79.     In particular, a MEDTRONIC-sponsored trial examining the application of rhBMP-2 using the PLIF procedure was halted in December 1999 when ectopic bone growth, inflammation and scar tissue — meaning bone growth, inflammation and scar tissue  wshere such growth is not desired—developed in a high number of patients. A doctor who participated in the study reported that one of the patients she treated required two extra surgeries to clear the excessive bone growth, inflammation and scar tissue  from the patient's spinal canal. The complications observed in ther PLIF trial were particularly serious given the potential of neural impingement (or nerve pinching) from such bony overgrowth in that procedure, potentially triggering the very sort of pain that a fusion procedure attempts to eliminate.

80.     Ther adverse event (bony overgrowth or ectopic bone growth, inflammation and scar tissue ) is precisely what happened to Plaintiff STEPHANIE CLAIR following her off-label posterior lumbar surgery.

81.     Plaintiff are informed and believe and based thereon allege that complications such as those noted in ther early PLIF trial result from Infuse®'s very mechanism of action. In such cases, Infuse® can stimulate bone growth, inflammation and scar tissue  where new bone is

not desired and can lead to excessive bone growth, inflammation and scar tissue  into areas where bone should not be growing -- i.e. into or against the spinal cord or other spinal nerves.

82.     There is insufficient scientific evidence concerning the proper dosages of rhBMP2 for use in the off-label procedures or the expected responses to the protein in different biological environments. Indeed, many adverse events associated with the use of Infuse® result from off-label use of the product by surgeons who do not fully understand the powerful nature of the protein.

83.     The MEDTRONIC defendants, while providing spine surgeons with MEDTRONIC-funded studies and published articles purporting to support the efficacy and safety of the off-label uses, simultaneously and systematically concealed or downplayed other non-MEDTRONIC-funded studies and articles demonstrating serious and frequent adverse events caused by the same off-label uses.

84.     Numerous medical studies published since the introduction of Infuse® have shown that its use in procedures not approved by the FDA can lead to serious, and even deadly, adverse events. A May 15, 2006 medical article in Spine entitled "Controlling Bone Morphogenetic Protein Diffusion and Bone Morphogenetic Protein-Stimulated Bone growth, inflammation and scar tissue  Using Fibrin Glue" observed that these complications often result from the product's mechanism of action. As the authors stated, "rhBMP-2 may stimulate bone growth, inflammation and scar tissue  in areas in which bone is not desired, especially as the material 'leaks' into such spaces. . . . Although ther phenomenon has not been thoroughly studied, it implies that the release of rhBMP-2 into the soft tissues stimulates a rapid, potentially life-threatening, inflammatory reaction."

85.     Susan Levine, a Vice President at Hayes, Inc., a company which evaluates medical technologies for insurers, has reported that she has reviewed the research work on Infuse®, and finds it "really distressing to see something like this used in a potentially harmful way and without adequate evidence." Ms. Levine has reportedly said that, when used properly, Infuse® can be "good for a patient."

86.     A number of patients report they have been harmed in off-label uses of Infuse®. At least 1,200 reports of adverse events involving Infuse® have been made to the FDA from 2002 to 2011.

87.     The number of Infuse-related adverse events is growing steadily over the years, as more information is gradually emerging concerning the side effects that have been previously hidden or downplayed by MEDTRONIC and its paid consultants.

88.     In 2011, for example, there have been 278 Infuse-related adverse events reported to date, in 2010, 362 adverse events were reported, and in 2009, 244 adverse events were reported.

89.     The vast majority of these adverse event reports involve off-label use of Infuse®.

**E.**    **Despite the Lack of Safety and Effectiveness, MEDTRONIC Illegally and Improperly Promoted and Marketed to Physicians the Off-Label Use of Infuse® through a Posterior Approach in the Lumbar Spine**

90.    Medical device companies look for surgeons who are known as "opinion leaders" and who will not only use a high volume of their devices, but who persuade other surgeons to use a particular device. Opinion leaders are physicians whose opinions on medical procedures and medical devices are held in high regard. If these influential physicians are willing to promote the use of a certain device, then other surgeons are likely to follow suit and use that device, sometimes including off-label uses which are illegal for the company itself to promote.

91.    Many medical device companies, including MEDTRONIC, cultivate relationships with these opinion leaders, paying them handsome (and in the case of Infuse®, sometimes seven-figure) consulting fees, travel expenses for seminars, and numerous other perks, to encourage these physicians to promote the use of a particular medical device.

92.    Not only did MEDTRONIC engage in such activities with respect to Infuse®, it improperly paid doctors to promote, both directly and indirectly, various off-label uses of Infuse® through the posterior and lateral approaches in lumbar spine fusions, and in the cervical spine. These payments were improper because they were orchestrated by MEDTRONIC to avoid the federal laws prohibiting medical device companies from promoting off-label uses of products.

93.    Plaintiff are informed and believe and based thereon allege that, at all relevant times, MEDTRONIC willfully ignored the FDA Advisory Panel's concerns over off-label uses, and regularly and continuously promoted, through its sales representatives and physician "opinion leaders," dangerous off-label uses of Infuse®.

94.    As set forth below, MEDTRONIC's senior management concealed MEDTRONIC's surreptitious efforts to promote the widespread off-label use of Infuse®.

95.    Plaintiff are informed and believe and based thereon allege that MEDTRONIC provided millions of dollars in undisclosed payments to certain spine surgeons (including so-called "opinion leaders") who published articles in medical journals, delivered presentations at continuing medical education courses, and appeared at consulting engagements to promote off-label applications of the Infuse®. In turn, MEDTRONIC's sales force would direct other physicians to these consultants and "opinion leaders" or to their written work to further drive off-label sales of the Infuse®.

96.    Under applicable FDCA and FDA regulations, device and drug manufacturers such as MEDTRONIC are prohibited from promoting products for uses not approved by the FDA. Indeed, federal law provides for significant penalties for manufacturers that promote their products in ways inconsistent with a product's labeling. Severe penalties for off-label promotion were designed to ensure that the FDA's careful, deliberate consideration of a product's suitability for public consumption is not undermined by manufacturers seeking to circumvent that process and increase sales by promoting dangerous or unstudied off-label uses.

97.     Plaintiff are informed and believe and based thereon allege that, despite the prohibition against off-label promotion, MEDTRONIC has actively promoted off-label use of Infuse® by, among other things, providing doctors with information about other doctors using the product off-label (including those "opinion leaders" paid huge sums of money by MEDTRONIC to serve as "consultants") and by having MEDTRONIC sales force personnel in the hospital operating rooms at the time of many off-label surgeries to provide doctors with information and instruction on off-label uses during the actual surgeries.

98.     Plaintiff are informed and believe and based thereon allege that, as a result of its illegal off-label promotion, sales of MEDTRONIC's Infuse® have soared and have totaled billions of dollars from 2002 to 2011. Infuse®'s sales for the last fiscal year alone exceeded $900 million.

99.     The medical community is finally beginning to learn of the serious risks associated with Infuse®. In June 2011, one of the leading journals on spine surgery, The *Spine Journal*, devoted an entire issue to publishing various articles regarding the risks associated with Infuse®, including articles on MEDTRONIC's failure to accurately report the side effects from its clinical trials; MEDTRONIC's failure to report that many of the authors who studied and promoted Infuse® had significant financial ties to MEDTRONIC with a median range of $12 to $16 million per study; that Infuse® can cause severe injuries to the spinal nerves and spinal cord; that off-label use of Infuse® can lead to other severe side effects; and that MEDTRONIC and its paid consultants/study authors downplayed the risks associated with Infuse®, over-emphasized its benefits and over-emphasized the risks associated with traditional non-Infuse® spine fusion procedures.

100.     The *Wall Street Journal* and *New York Times*, for example, reported in 2009 that MEDTRONIC consultant Timothy Kuklo, M.D., while an orthopedic surgeon at Walter Reed Army Medical Center, submitted an article to a British medical journal with allegedly fabricated claims regarding the efficacy of Infuse® and reporting that Dr. Kuklo allegedly forged the signatures of the four "co-authors" of the paper. MEDTRONIC confirmed that Dr. Kuklo was a paid consultant for MEDTRONIC and that the company has paid him over $800,000 over an eight year period.

## F.     The Qui Tam Actions Against MEDTRONIC

101.     Defendants here, MEDTRONIC, INC. and MEDTRONIC SOFAMOR DANEK USA, INC., were named as defendants in two qui tam actions, *United States ex rel. (UNDER SEAL) v. Medtronic. Inc., et al*., Civil Action No. 02-2709 (W. D. Tenn.), and *United States ex rel. Poteet v. Medtronic, Inc., et al*., Civil Action No. 03-2979 (W. D. Tenn.) (collectively the "qui tam lawsuits"), both of which alleged that MEDTRONIC violated the False Claims Act, 31 U.S.C. § 3729, et seq., by paying illegal kickbacks to physicians in connection with promoting the off-label use of Infuse® in the spine, which resulted in the submission of false or fraudulent claims to federal health care programs.

102.     In these lawsuits, the United States Department of Justice ("DOJ") contended that between January 1, 1998 and April 30, 2003, MEDTRONIC made payments and provided other remuneration to a number of physicians and entities in connection with its spinal products in the

form of (1) payments and other remuneration for physicians' attendance and expenses at medical education events, "think tanks", VIP/opinion leader events, and meetings at resort locations; (2) services and payments for services to physicians through MEDTRONIC's Healthcare Economic Services and eBusiness Departments; and (3) payments made pursuant to consulting, royalty, fellowship and research agreements with various physicians and entities

103.    Based on its investigation, the DOJ contended that certain of the payments, services, and remuneration mentioned above were improper and resulted in the submission of false or fraudulent claims.

104.    In July 2006, MEDTRONIC agreed to pay $40 million to the United States of America to settle these lawsuits under the False Claims Act, 31 U.S.C. §§ 3729-3733, the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, and the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-12.

105.    As a result of ther settlement, MEDTRONIC and MEDTRONIC SOFAMOR DANEK agreed to enter into a Corporate Integrity Agreement with the Department of Health and Human Services Office of Inspector General.

106.    Also, as a result of ther settlement, MEDTRONIC agreed to negotiate with representatives of the National Association of Medicaid Fraud Control Units to reach an agreement that provides for distribution of certain sums to the several states with which MEDTRONIC agreed to a settlement concerning the conduct at issue in the lawsuits.

107.    Despite its 2006 settlement with the DOJ, and on information and belief, MEDTRONIC has continued to improperly and illegally promote the off-label use of Infuse® in non-FDA-approved spine surgeries.

### G.    September 30, 2008 Letter from United States Senators Sherb Kohl and Charles Grassley to MEDTRONIC Regarding Ongoing Concerns over MEDTRONIC's Payments to Doctors Related to the Promotion and Marketing of Infuse®

108.    Despite the July 2006 Settlement with the DOJ, concerns regarding MEDTRONIC's off-label marketing activities and related payments to doctors continued.

109.    On September 30, 2008, U.S. Senator Herb Kohl sent a letter to MEDTRONIC noting that earlier in 2008, MEDTRONIC's outside counsel provided to the Special Committee on Aging a written account of MEDTRONIC's efforts to comply with the July 2006 Settlement Agreement it reached with the DOJ concerning allegations that MEDTRONIC and its subsidiary improperly compensated surgeons and physicians in connection with the Infuse® device.

110.    Senator Kohl's letter expressed several concerns, including the following:

That account also addressed the corporate integrity agreement (CIA) that MEDTRONIC and its subsidiary entered into with the Office of the Inspector General of the United States Department of Health and Human Services stemming from those same

allegations. In that same letter to the Committee, MEDTRONIC
and its subsidiary both denied that "improper payments were
made to physicians in the first place (MEDTRONIC's agreement
with DOJ does not contain any admission of liability), much less
that improper payments 'have continued.''' Consequently, it was
with concern that I read recent articles, in the *Wall Street Journal*
and elsewhere, which outlined highly disturbing allegations of
improper, if not illegal, payments by MEDTRONIC to surgeons
and physicians.

These continuing allegations are directly relevant to the
Committee's oversight of inappropriate physician compensation
practices within the medical device industry. All of the major
orthopedic device companies that settled with DOJ over such
allegations were required to publicly reveal information related
to their payments to physicians. MEDTRONIC's response to the
Committee's initial inquiry articulated no specific reasons as to
why MEDTRONIC has yet to voluntarily make the same
disclosures.

111.    In ther letter, Senator Kohl requested both documentation of MEDTRONIC's
efforts to comply with the July 2006 Settlement Agreement and interviews with corporate
witnesses and documents "given the ongoing, serious concerns publicly raised regarding the
integrity and transparency of MEDTRONIC's physician compensation practices."

112.    Senator Kohl also asked MEDTRONIC to explain "the circumstances that led
MEDTRONIC's former counsel to file suit against the company [alleging improper payments to
physicians] and how that matter was subsequently settled."

113.    Also on September 30, 2008, U.S. Senator Charles Grassley sent a similar letter to
MEDTRONIC pertaining to the marketing of Infuse® and allegations of related kickbacks to
physicians regarding the sale of Infuse®, noting that:

Last week, the *Wall Street Journal (WSJ)* reported on
allegations of financial perks provided to doctors that included
"entertainment at a Memphis strip club, trips to Alaska and
patent royalties on inventions they played no part in."[5] I would
appreciate your assistance in better understanding these
allegations and would like to take the opportunity to lay out my
specific concerns and questions.

114.    Senator Grassley went on to express her concern over the *Wall Street Journal*'s
reports "that one of the incentives MEDTRONIC provided physicians was to include them on
patents for medical devices and reward them with royalties, even though the physicians may not
have contributed to the development of the product."  The letter specifically addressed issues
related to MEDTRONIC's marketing of Infuse®:

---

[5] David Armstrong, "Lawsuit Says MEDTRONIC Gave
Doctors Array of Perks," *Wall St. J.*, Sept. 25, 2008.

The WSJ reported on problems with off-label use of MEDTRONIC's Infuse®. Infuse® is a bone graft replacement technology that uses a protein which creates bone. Specifically, it was reported that MEDTRONIC gave payments to physicians, in the form of consulting agreements, as a means of increasing sales of Infuse®. The allegations that MEDTRONIC has been disguising these consulting agreements as inducements or kickbacks for physicians to use Infuse® are equally troubling. Likewise, this is a practice that I would like to better understand and I would like to know what if anything has changed since these reported events.

115.    Senator Grassley, in her September 30, 2008 letter, also questioned why several lawsuits against MEDTRONIC pertaining to Infuse® remained under seal, and indicated that she would like to "better understand the status of these lawsuits and the procedural process that has led to the current situation."

### H.    June 1, 2011 Issue of the *Spine Journal*

116.    On June 1, 2011, the *Spine Journal* , a leading medical journal in the United States, published a special edition dedicated to addressing serious patient safety concerns and ethical concerns related to the use of rhBMP-2 (Infuse®) in the spine.

117.    The special edition reviewed thirteen peer-reviewed articles about rhBMP-2 by MEDTRONIC-sponsored authors, and concluded that these articles had inaccurately reported the safety of rhBMP-2 applications in the spine by underestimating its risks.

118.    In an editorial summarizing the findings of ther special issue, five prominent physicians, including spine surgeons at Stanford University, wrote that the earlier industry-sponsored trials and reports were "remarkable for the complete absence of reported rhBMP-2-related clinical adverse events." For example, the industry-sponsored articles omitted mention of indications from the earliest trials of inflammatory reactions, adverse back and leg pain events, radiculitis, retrograde ejaculation, urinary retention, bone resorption, and implant displacement. They also omitted mention of sterility and cancer risks associated with rhBMP-2, as reported in FDA documents and hearings. The trials and reports suffered from idiosyncratic trial design, reporting bias, and peer-review/publication shortfalls.

119.    According to the editorial and several of the accompanying articles, the thirteen MEDTRONIC-funded articles reported only successful fusions and extremely low or nonexistent rates of complications with Infuse®, which led to the growth of "off-label" use of Infuse® in lumbar fusion procedures. The articles "may have promoted widespread poorly considered on-and off-label use, eventual life-threatening complications and deaths."

120.    Contrary to the conclusions of the earlier MEDTRONIC-sponsored trials and articles, an article in the special issue of the *Spine Journal* suggested "an estimate of adverse events associated with rhBMP-2 use in spine fusion ranging from 10% to 50% depending on approach."

Anterior cervical fusion with rhBMP-2 has an estimated 40%

> greater risk of adverse events with rhBMP-2 in the early
> postoperative period, including life-threatening events. After
> anterior interbody lumbar fusion rates of implant displacement,
> subsidence, infection, urogenital events, and retrograde ejaculation
> were higsher after using rhBMP-2 than controls. *Posterior lumbar
> interbody fusion was associated with radiculitis, ectopic bone
> formation, osteolysis, and poorer global outcomes.* In
> posterolateral fusions, the risk of adverse effects associated with
> rhBMP-2 use was equivalent to or greater than that of iliac crest
> bone graft harvesting, and 15% to 20% of subjects reported early
> back pain and leg pain adverse events; higsher doses of rhBMP-2
> were also associated with a greater apparent risk of new
> malignancy."

Eugene J. Carragee, Eric L. Hurwitz & Bradley K. Weiner, *A Critical Review Of Recombinant
Human Bone Morphogenetic Protein-2 Trials In Spinal Surgery: Emerging Safety Concerns And
Lessons Learned*, the *Spine Journal* 11, 471-72 (2011) (emphasis added).

121.    The article also reported that ten of the earlier industry-sponsored rhBMP-2 trials
were funded in whole or in part by the manufacturer of rhBMP-2 (Infuse®), MEDTRONIC, Inc.
Furthermore, in twelve of these earlier studies, the median-known financial association between
the authors and MEDTRONIC Inc. was approximately $12,000,000-$16,000,000 per study
(range, $560,000-$23,500,000). *Id*. at 475.

I.    **June 21, 2011 Letter from United States Senators Charles Grassley and Max
Baucus to MEDTRONIC Regarding Continuing Concerns Over Illegal
Off-Label Promotion of Infuse® by MEDTRONIC, and New Concerns
over  Concealment of Adverse Events Caused by Infuse®**

122.    The U.S. Senate Committee on Finance is currently investigating wshether
MEDTRONIC has continued to misrepresent the adverse events that result from Infuse® and
rhBMP-2, as well as the possibility that MEDTRONIC improperly influenced clinical trials and
reporting regarding rhBMP-2.

123.    On June 21, 2011, U.S. Senators Charles Grassley and Max Baucus sent another
letter to MEDTRONIC on behalf of the Senate Committee on Finance requesting that
MEDTRONIC produce documents and communications pertaining to "adverse postoperative
events and/or medical complications" resulting from the use of rhBMP-2.[6] The letter also
requests that MEDTRONIC provide "[a] detailed account of payments that MEDTRONIC made
to all Infuse® clinical investigators."

124.    In their June 21 letter, Senators Grassley and Baucus state: "We are extremely
troubled by press reports suggesting that doctors conducting clinical trials examining the safety
and effectiveness of Infuse® on behalf of MEDTRONIC were aware that Infuse®, a treatment
commonly used in spinal surgery, may cause medical
complications, but failed to report ther in

---

[6] Letter from Grassley and Baucus (June 21, 2011), *available
at*, http://finance.senate.gov/newsroom/chairman/release.

the medical literature. Ther issue is compounded by the fact that some clinical investigators have substantial financial ties to MEDTRONIC."

125. The letter further states: "We are also concerned that other severe side-effects of Infuse® and similar bone-growth products developed by MEDTRONIC may have been unreported or under-reported in clinical literature. Reports have linked Infuse® to potentially fatal swelling in the neck and throat, and radiating leg pain. Concerns have also been expressed about a potential link to cancer."

**J.    December 13, 2011 Letter from United States Senators Sherb Kohl, Charles Grassley and Richard Blumenthal to MEDTRONIC Regarding Continuing Concerns Over Illegal Off-Label Promotion of Infuse® by MEDTRONIC, and new Concerns over Concealment of Adverse Events Caused by Infuse**

126. Senators Herb Kohl, Charles Grassley, and Richard Blumenthal wrote to MEDTRONIC again in December 2011 demanding more information from the company over adverse events caused by on-label and off-label use of Infuse®. The letter noted that "your company has experienced safety issues, such as with your spine product Infuse®."

127. The letter also demanded that MEDTRONIC explain whether or not it requires physicians who receive funds from MEDTRONIC to disclose those payments to their patients before the patients receive one of MEDTRONIC's medical devices. And "If not, why not?"

128. The inquiry is directly relevant to Plaintiff STEPHANIE CLAIR for many reasons, including the fact that Her surgeon failed to disclose to Ms. CLAIR or her wife prior to performing Ms. CLAIR' November 3, 2007 off-label Infuse® spine surgery that she was a highly paid MEDTRONIC consultant.

**K.    Plaintiff STEPHANIE CLAIR's Off-Label Surgery and Subsequent Treatment**

129. STEPHANIE CLAIR was admitted to the Sky Ridge Hospital in Colorado for spine surgery to address chronic lower back pain.

130.    During the surgery, her surgeon implanted MEDTRONIC's product Infuse® into Ms. CLAIR's spine using an off-label posterior approach.

131.    Ms. CLAIR's post-operative period was marked by increasingly severe pain in her back and pain in her legs. Ms. CLAIR continued to complain about ther increased pain to her surgeon during numerous visits for approximately one year after the surgery.

132.    Imaging studies showed that Ms. CLAIR had inflammation, scar tissue  and nerve compression at various levels of the spine.

133.    Plaintiff's surgeon discovered the inflammation and scar tissue  in her patient at some time after the October 2014 surgery, but never told Ms. CLAIR that it was unusual, was injuring her, or that it was caused by the use of Infuse®.

134.    Her surgeon also assured Ms. CLAIR that her post-surgery pain was the ordinary pain attributable to recovery or anticipated complications from a spine surgery.

135.    Throughout 2014 to present, Ms. CLAIR continued to be treated by her surgeon.  Ms. CLAIR's last surgical treatment by her surgeon was on January 26, 2015 at Parker Adventist Hospital, when she woke up paralyzed as a complication of surgery.  She was told that she might recover some use of her legs, but has not experienced any improvement.

136.    Having no relief from her paralysis and severe pain, Ms. CLAIR obtained copies of her medical records in January, 2017 and discovered the use of Infuse® and that her condition requiring surgeries on in 2014, and 2015 was suspected to be related to the use of Infuse®.

## SUMMARY OF ALLEGATIONS

137.    At all relevant times, Infuse® was researched, developed, manufactured, marketed, promoted, advertised and sold by the MEDTRONIC Defendants.

138.    Plaintiff STEPHANIE CLAIR suffered grievous personal injuries as a direct and proximate result of Defendants' misconduct.

139.    Plaintiff STEPHANIE CLAIR would not have consented to be treated with the off-label use of Infuse® had she known of or been informed by Defendants of the true risks of the off-label use of Infuse®.

140.    At all relevant times, the MEDTRONIC Defendants misrepresented the safety of Infuse® to physicians and patients, including to Plaintiff STEPHANIE CLAIR and her physicians, acting in concert with Defendants, intentionally failed to inform Plaintiff STEPHANIE CLAIR of the significant danger to patients of the off-label use of Infuse® in the lumbar spine.

141.    At all relevant times, the MEDTRONIC Defendants negligently manufactured, marketed, advertised, promoted, sold and distributed Infuse® as a safe and effective device to be used for spinal fusion surgery. MEDTRONIC negligently, recklessly, and/or intentionally over-promoted Infuse® to physicians and consumers, including to surgeons who used Infuse® on Plaintiff STEPHANIE CLAIR, and concealed from or downplayed to physicians and consumers its dangerous side effects, including but not limited to the risk of ectopic bone growth, inflammation and scar tissue  in off-label spine surgeries.

142.    Any warnings MEDTRONIC may have issued concerning the dangers of off-label use of Infuse® or regarding the risk of ectopic bone growth, inflammation and scar tissue were insufficient in light of MEDTRONIC's contradictory prior, contemporaneous and continuing illegal promotional efforts and overpromotion of Infuse® for non-FDA-approved off-label uses in the lumbar spine and contemporaneous efforts to hide or downplay the true risks of Infuse®.

143.    At all relevant times, MEDTRONIC knew, and/or had reason to know, that

Infuse® was not safe for off-label uses in the spine because the device had never been approved for use in the spine other than in anterior approach lumbar fusion surgeries with a LT-Cage®; and its safety and efficacy for use without a LT-Cage® or in a posterior approach was either unknown, or was known by these Defendants to be unsafe and ineffective.

144.    In the alternative, at all relevant times, Defendant Her surgeon knew, and/or had reason to know, that Infuse® was not safe for off-label uses in the spine because the device had never been approved for use in the spine other than in anterior approach lumbar fusion surgeries with a LT-Cage®; and its safety and efficacy for use without a LT-Cage® or in a posterior approach was either unknown, or was known by ther Defendant to be unsafe and ineffective.

145.    In off-label lumbar spine surgeries, Infuse® often leads to serious complications including, but not limited to, radiculitis, ectopic bone formation, osteolysis, and poorer global outcomes, and, as in Plaintiff STEPHANIE CLAIR's case, pain in her back and legs caused by ectopic bone growth, inflammation and scar tissue .

146.    When used off-label, Infuse® has often failed to work in a safe and effective manner, and was defective, thereby causing serious medical problems and, in some patients, like STEPHANIE CLAIR, catastrophic injuries.

147.    At all relevant times, MEDTRONIC knew, and/or had reason to know, that its representations and suggestions to physicians that Infuse® was safe and effective for use in off-label surgeries were materially false and misleading.

148.    MEDTRONIC and her surgeon knew and/or had reason to know of the likelihood of serious injuries caused by the off-label use of Infuse® in the spine, but they concealed ther information and did not warn Plaintiff STEPHANIE CLAIR or her other physicians, preventing Plaintiff and her other physicians from making informed choices in selecting other treatments or therapies prior to surgery and preventing them from timely discovering Ms. CLAIR's injuries.

149.    Plaintiff relied on MEDTRONIC's and/or her surgeon's misrepresentations regarding the safety and efficacy of Infuse® in making her decision to allow Infuse® to be used in her spine surgery. Plaintiff did not know of the specific risks, and/or was misled by MEDTRONIC and/or her surgeon as to the nature and incidence of the true specific risks related to the off-label use of Infuse® in lumbar spine surgeries.  Her surgeon was acting in concert with MEDTRONIC at all times pertinent hereto.

150.    The MEDTRONIC Defendants improperly promoted and marketed Infuse® to Plaintiff's surgeon for off-label use in the spine, and ther promotion and marketing influenced her surgeon's decision to implant Infuse® in Plaintiff's spine using an off-label approach.

151.    At all times herein mentioned, each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venturer of each of the other Defendants herein and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their

collective conduct constituted a breach of duty owed to the Plaintiff.

152.    At all times herein mentioned, Defendants were fully informed of the actions of their agents and employees, and thereafter no officer, director or managing agent of Defendants repudiated those actions, which failure to repudiate constituted adoption and approval of said actions and all Defendants and each of them, thereby ratified those actions.

153.    There exists and, at all times herein mentioned there existed, a unity of interest in ownership between certain Defendants and other certain Defendants, such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter-ego of the other certain Defendants and exerted control over those Defendants. Adherence to the fiction of the separate existence of these certain Defendants as entities distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction a fraud and/or would promote injustice.

154.    At all times herein mentioned, the MEDTRONIC Defendants, and each of them, were engaged in the business of, or were successors in interest to, entities engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing and/or advertising for sale, and selling products for use by the Plaintiff and her physicians. As such, each of the MEDTRONIC Defendants is individually, as well as jointly and severally, liable to the Plaintiff for their damages.

155.    The harm which has been caused to Plaintiff resulted from the conduct of one, or various combinations of the Defendants, and through no fault of the Plaintiff. There may be uncertainty as to which one or which combination of Defendants caused the harm. Defendants have superior knowledge and information on the subject of which one or which combination of the Defendants caused Plaintiff' injuries.

156.    Thus, the burden of proof should be upon each Defendant to prove that the Defendant has not caused the harms suffered by Plaintiff.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Fraudulent Misrepresentation and Fraud in the Inducement)

157.    Plaintiff STEPHANIE CLAIR incorporates by reference all previous paragraphs of her Complaint as if fully set forth here and further alleges as follows:

158.    In connection with their Infuse® products, the MEDTRONIC Defendants fraudulently and intentionally misrepresented material and important health and safety product risk information from Plaintiff and her physicians, all as alleged in ther Complaint. Plaintiff and her physicians would not have decided to use the off-label use of Infuse® for posterior-approach lumbar spine fusion surgery had they known of the safety risks related to Infuse®.

159.    The MEDTRONIC Defendants marketed their Infuse® product to and for the

benefit of Plaintiff, and marketed it to her physicians, and Defendants knew or had reason to know of the unreasonable dangers and defects in their Infuse® product, and that Plaintiff and her physicians would use the product.

160. Any of the following is sufficient to independently establish the MEDTRONIC Defendants' liability for fraudulent misrepresentation and/or fraud in the inducement:

a.    The MEDTRONIC Defendants fraudulently concealed and misrepresented the shealth and safety hazards, symptoms, constellation of symptoms, diseases and/or shealth problems associated with the off-label use of Infuse®;

b.    The MEDTRONIC Defendants fraudulently concealed and misrepresented their practice of promoting and marketing to physicians, including Plaintiff's physician, the off-label use of Infuse® in posterior-approach lumbar spine surgery;

c.    The MEDTRONIC Defendants fraudulently concealed and misrepresented information about the known comparative risks and benefits of the use of Infuse® and the relative benefits and availability of alternate products, treatments and/or therapies.

161. The MEDTRONIC Defendants knew, or should have known, that they were concealing and misrepresenting true information about the known comparative risks and benefits of the use of Infuse® and the relative benefits and availability of alternate products, treatments and/or therapies.

162. The MEDTRONIC Defendants knew that Plaintiff and her physicians would regard the matters Defendants concealed and misrepresented to be important in determining the course of treatment for the Plaintiff, including Plaintiff and her physician's decision wshether or not to use Infuse® in Plaintiff's posterior-approach spine surgery.

163. The MEDTRONIC Defendants intended to cause Plaintiff and her physicians to rely on their concealment of information and misrepresentations about the safety risks related to Infuse® to induce them to make off-label use of Infuse® for Plaintiff's posterior-approach lumbar spine fusion surgery.

164. Plaintiff and her physicians were justified in relying, and did rely, on Defendants' concealment of information and misrepresentations about the safety risks related to Infuse® in deciding to make off-label use of Infuse® for posterior-approach lumbar spine fusion surgery.

165. As the direct, proximate and legal cause and result of the Defendants' fraudulent concealment and misrepresentations and suppression of material shealth and safety risks relating to Infuse® and Defendants' dangerous and irresponsible marketing and promotion practices, Plaintiff has been injured and has incurred damages, including but not limited to medical and hospital expenses, lost wages and lost earning capacity, physical and mental pain and suffering, and loss of the enjoyment of life.

166. Plaintiff is therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

## SECOND CAUSE OF ACTION

### (Strict Products Liability – Failure To Warn)

167.    Plaintiff incorporates by reference all previous paragraphs of her Complaint as if fully set forth here and further alleges as follows:

168.    MEDTRONIC had a duty to warn Plaintiff and her physicians about the dangers of Infuse® of which it knew, or in the exercise of ordinary care, should have known, at the time the Infuse® left the Defendants' control. The MEDTRONIC Defendants did know of these dangers of off-label use of Infuse®, and breached their duty by failing to warn Plaintiff and her physicians of the dangers of its off-label use in posterior-approach lumbar spine surgery.

169.    Defendants, and each of them, knew that Infuse® would be purchased and used without inspection for defects in the design of the product.

170.    The Infuse® used in Ms. CLAIR was defective when it left the control of each of these Defendants.

171.    Defendants knew or should have known of the substantial dangers involved in the reasonably foreseeable use of Infuse®, whose defective design, manufacturing, and lack of sufficient warnings caused Infuse® to have an unreasonably dangerous propensity to cause catastrophic injuries.

172.    The warnings accompanying the Infuse® product did not adequately warn Plaintiff and her physicians, in light of its scientific and medical knowledge at the time, of the dangers associated with Infuse® when used off-label in posterior-approach lumbar spine surgery including, but not limited to, pain and weakness in limbs, radiculitis, ectopic bone formation, osteolysis, and poorer global outcomes than alternative treatments.

173.    The warnings accompanying the Infuse® product failed to provide the level of information that an ordinary physician or consumer would expect when using the product in a manner reasonably foreseeable to MEDTRONIC. MEDTRONIC either recklessly or intentionally minimized and/or downplayed the risks of serious side effects related to the off-label use of Infuse®, including but not limited to the risk of ectopic or uncontrolled bone growth, inflammation and scar tissue .

174.    Defendants failed to provide adequate warnings, instructions, guidelines or admonitions to members of the consuming public, including Plaintiff and her physicians, of the design and manufacturing defects, which Defendants knew, or in the exercise of reasonable care should have known, to have existed in Infuse®.

175.    Defendants knew that these substantial dangers are not readily recognizable to an ordinary consumer or physicians, and that consumers and physicians would purchase Infuse® without inspection.

176.    At the time of Plaintiff's injury, Infuse® was being used in a manner promoted by Defendants, and in a manner that was reasonably foreseeable by Defendants as involving substantial danger that was not readily apparent to its users.

177.    Plaintiff's physician relied on MEDTRONIC's inadequate warnings in deciding to use Infuse® in an off-label manner. Plaintiff and her physician would not have made off-label use of Infuse® for posterior-approach lumbar spine fusion surgery had they known of the true safety risks related to Infuse®.

178.    As a direct and proximate result of one or more of the above-listed dangerous conditions and defects, and of MEDTRONIC's failure to provide adequate warnings about them, Plaintiff sustained serious injuries of a personal and pecuniary nature.

179.    Plaintiff has sustained extreme pain, suffering, and anguish from the date of her posterior-approach lumbar spine surgery with Infuse® until present.

## THIRD CAUSE OF ACTION

### (Strict Products Liability – Manufacturing Defect)

180.    Plaintiff incorporates by reference all previous paragraphs of ther Complaint as if fully set forth here and further alleges as follows:

181.    At all relevant times, Defendants were engaged in the business of selling Infuse® for resale or use, and in fact did sell the Infuse® device used by her surgeon in Ms. CLAIR's surgery. Defendants' Infuse® device was defectively manufactured at the time that it left the Defendants' control and was placed into the stream of commerce in Colorado. The device was expected to and in fact did reach Plaintiff without a substantial change in the condition in which it was sold.

182.    The Infuse® product was unreasonably dangerous in that it was unsafe when used as it was promoted by MEDTRONIC for use in off-label posterior-approach lumbar spine surgeries.

183.    The Infuse® product was not manufactured in conformity with the manufacturer's design.

184.    The Infuse® product failed to perform as safely as an ordinary consumer would expect.

185.    Plaintiff and her physicians were persons reasonable expected to use the Infuse® product, and they used Infuse® in the way Defendants intended and promoted it to be used.

186.    Plaintiff and her physicians could not have discovered any defect in the Infuse® product through the exercise of due care.

187.    MEDTRONIC, as designer, manufacturer, marketer, and distributor of the Infuse® product, is held to a higher level of knowledge in their field.

188.    Plaintiff and her physicians did not have substantially the same knowledge as the designer, manufacturer or distributor: MEDTRONIC.

189.    Defendants' unreasonably dangerous and defectively-manufactured Infuse® was the direct, legal and proximate cause of Plaintiff's injuries and damages including, but not limited to, medical and hospital expenses and lost wages.

190.    As a direct and proximate result of one or more of the above-listed dangerous conditions and defects, Plaintiff has sustained serious injuries of a personal and pecuniary nature.

191.    Plaintiff has sustained extreme pain, suffering, and anguish from the date of her posterior-approach lumbar spine surgery with Infuse®.

## FOURTH CAUSE OF ACTION

### (Strict Products Liability – Design Defect)

192.    Plaintiff incorporates by reference all previous paragraphs of her Complaint as if fully set forth here and further alleges as follows:

193.    Defendants' Infuse® device was defectively designed at the time that it left the Defendants' control and was placed into the stream of commerce in Colorado. The device reached Plaintiff without a substantial change in the condition in which it was sold.

194.    Defendants' Infuse® device was defectively designed because the design was unsafe when used in the manner promoted by Defendants and/or in a manner reasonably foreseeable by Defendants. The Infuse® product failed to perform as safely as an ordinary consumer would expect when used, as it was promoted by MEDTRONIC for use in off-label posterior-approach lumbar spine surgeries.

195.    Defendants' Infuse® device was defectively designed because the risks of danger in the design outweigh the benefits of the design.

196.    The Infuse® product was designed in a way that caused users to suffer injuries including, but not limited to, pain and weakness in limbs, radiculitis, ectopic bone formation, osteolysis, and poorer global outcomes than equally-effective, alternative designs and treatments.

197.    The foreseeable risks of harm posed by using the Infuse® product in a manner promoted by Defendants could have been reduced or avoided by adopting a reasonably alternative design. Defendants did not adopt a design that would have rendered the Infuse® product reasonably safe.

198.    Plaintiff and her physicians used Infuse® in a manner intended and reasonably foreseeable by Defendants.

199.    Plaintiff was not aware of the aforementioned defects at any time prior to the injuries caused by the Infuse®.

200.    As a legal and proximate result of the aforementioned defects of Infuse®, Plaintiff has sustained the injuries and damages set forth herein.

201.    Plaintiff is, therefore, entitled to damages in an amount to be proven at the time of trial.

## FIFTH CAUSE OF ACTION

### (Strict Product Liability – Misrepresentation)

202.    Plaintiff incorporates by reference all previous paragraphs of her Complaint as if fully set forth here and further alleges as follows:

203.    Specific defects in the Infuse® product, as specified above in her Complaint, rendered it defective and unreasonably dangerous.

204.    At all relevant times, Defendants were engaged in the business of selling Infuse® for resale or use, and in fact did sell the Infuse® device used by her surgeon in Ms. CLAIR. In the course of marketing Infuse®, the MEDTRONIC Defendants made untrue representations of material facts and omitted material information to Plaintiff, her physicians, and the public at large. The MEDTRONIC Defendants sponsored biased medical trials, reports, and articles that wrongfully and inaccurately claimed that the dangers inherent to off-label use of Infuse® did not exist or were significantly less than the actual dangers. The MEDTRONIC Defendants made these misrepresentations and omissions to guide doctors and physicians in their purchase and use of Infuse®.

205.    Plaintiff and her physicians would not have purchased and made off-label use of Infuse® for posterior-approach lumbar spine fusion surgery had they known of the true safety risks related to Infuse®.

206.    Defendants were negligent in making the untrue misrepresentations and omitting material information because Defendants knew, or had reason to know, of the actual, unreasonable dangers and defects in their Infuse® product.

207.    Plaintiff and her physicians would reasonably be expected to use Infuse®. Defendants intended to induce Plaintiff and her physicians to rely on their misrepresentations and omissions to use Infuse® in an off-label manner.

208.    Plaintiff and her physicians were justified in relying, and did rely, on the misrepresentations and omissions about the safety risks related to Infuse® in deciding to make off-label use of Infuse® for posterior-approach lumbar spine fusion surgery.

209.    As the direct, producing, proximate and legal result of the Defendants'

- 25 -

misrepresentations, Plaintiff has suffered severe physical pain, medical and hospital expenses, lost wages, pain and suffering, and pecuniary loss.

210. Plaintiff is therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

## SIXTH CAUSE OF ACTION

### (Product Liability – Negligence)

211. Plaintiff incorporates by reference all previous paragraphs of her Complaint as if fully set forth here and further alleges as follows:

212. Defendants marketed their Infuse® product to and for the benefit of Plaintiff, and additionally marketed it to her physicians, and these Defendants knew or should have known that Plaintiff and her physicians would use their product, including for the off-label use of posterior-approach lumbar spine fusion.

213. Defendants owed Plaintiff and her physicians duties to exercise reasonable or ordinary care under the circumstances in light of the generally recognized and prevailing best scientific knowledge.

214. Defendants had a confidential and special relationship with Plaintiff due to (a) Defendants' vastly superior knowledge of the health and safety risks relating to Infuse®, and (b) Defendants' sole and/or superior knowledge of their dangerous and irresponsible practices of improperly promoting to physicians the off-label use of Infuse® for posterior-approach lumbar spine surgeries.

215. As a result, Defendants had an affirmative duty to fully and adequately warn Plaintiff and her physicians of the true health and safety risks related to the off-label use of Infuse®, and Defendants had a duty to disclose their dangerous and irresponsible practices of improperly promoting to physicians the off-label use of Infuse® for posterior-approach lumbar spine fusion surgery. Independent of any special relationship of confidence or trust, Defendants had a duty not to conceal the dangers of the off-label use of Infuse® to Plaintiff and her physicians.

216. Misrepresentations made by Defendants about the shealth and safety of Infuse® independently imposed a duty upon Defendants to fully and accurately disclose to Plaintiff and her physicians the true health and safety risks related to Infuse®, and a duty to disclose their dangerous and irresponsible off-label promotion and marketing practices.

217. Through the conduct described in the foregoing and subsequent paragraphs of her Complaint, Defendants breached their duties to Plaintiff and to her physicians.

218. The following sub-paragraphs summarize, inter alia, Defendants' breaches of duties to Plaintiff and her physicians and describe categories of acts or omissions constituting breaches of duty by these Defendants. Each and/or any of these acts or

- 26 -

omissions establishes an independent basis for these Defendants' liability in negligence:

        a.      Unreasonable and improper promotion and marketing of Infuse® to physicians, including but not limited to the promotion and marketing of Infuse® for off-label use in posterior-approach lumbar spine fusion surgeries;

        b.      Failure to warn physicians and Plaintiff of the dangers associated with Infuse® when used off-label in posterior-approach lumbar spine surgery including, but not limited to, pain and weakness in limbs, radiculitis, ectopic bone formation, osteolysis, and poorer global outcomes than alternative treatments;

        c.      Failure to exercise reasonable care by not complying with federal law and regulations applicable to the sale and marketing of Infuse®; and

        d.      Failure to exercise reasonable care to prevent Infuse® from creating an unreasonable risk of harm to Plaintiff and other consumers who might reasonably be expected to be harmed by Infuse® while it was being used in the manner the MEDTRONIC Defendants should have reasonably expected.

219. Defendants knew, or should have known, that, due to their failure to use reasonable care, Plaintiff and her physicians would use and did use Infuse®, to the detriment of Plaintiff's health, safety and well-being.

220. As the direct, producing, proximate and legal result of the Defendants' misrepresentations, Plaintiff has suffered severe physical pain, medical and hospital expenses, lost wages, pain and suffering, and pecuniary loss.

221. Plaintiff is therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.


## PRAYER FOR RELIEF

     WHEREFORE, Plaintiff prays for judgment against all Defendants, and each of them, as follows:

        1.      For compensatory damages and general damages, economic and non-economic, sustained by all Plaintiff against all Defendants, jointly and severally, in an amount to be determined at trial;

        2.      For an award of prejudgment interest, costs, disbursements and reasonable attorneys' fees; and

        3.      For such other and further relief as the Court deems equitable or appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues stated.

Dated: January 25, 2017                    */s/ James W. Avery*
                                           James W. Avery

                                  ATTORNEY FOR  PLAINTIFF